Filed 4/30/26  P. v. Lopez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GABRIEL PORFIRIO LOPEZ,<br><br>Defendant and Appellant. | H051613<br>(Monterey County<br>Super. Ct. No. 22CR008608) |

Defendant Gabriel Porfirio Lopez was convicted by jury of four counts of oral copulation or sexual penetration of a child 10 years old or younger (Pen. Code, § 288.7, subd. (b); counts 1, 3, 5, and 13; unspecified statutory references are to this Code); eight counts of forcible lewd acts on a child under 14 years old (§ 288, subd. (b)(1); counts 2, 4, 6, and 8-12); forcible rape of a child under 14 years old (§ 261, subd. (a)(2); count 7); and lewd acts on a child under 14 years old (§ 288, subd. (a); count 14).  He now argues his trial counsel was ineffective for, among other things, not moving to suppress a recorded confession as obtained in violation of his Fifth Amendment rights.  Defendant also takes issue with certain testimony of an expert on child sexual abuse, the prosecutor's conduct during trial, and information provided to the jury.  He also challenges the sufficiency of the evidence on count 11.  The Attorney General concedes the evidence was insufficient as to that count, and we will accept the concession.  We will also reverse the convictions on counts 2, 4, 6, 7, 10, and 12 due to a prejudicial error on the verdict forms for those counts.

Although we acknowledge numerous other unacceptable errors in the conduct of defendant's trial, we conclude they do not warrant reversal of the remaining convictions because defendant has not shown prejudice. We will therefore uphold the convictions on counts 1, 3, 5, 8, 9, 13, and 14. By previous order we have considered with this appeal defendant's habeas corpus petition alleging ineffective assistance of counsel, and we deny that petition by separate order filed this day.

## I.    BACKGROUND

The charges against defendant stemmed from his alleged abuse of Jane Doe 1 and Jane Doe 2, the daughters of his then-wife L.P. (Consistent with rule 8.90 of the California Rules of Court, and to protect the victims' privacy, we refer to L.P. by her initials.)

### A. DOE 1'S DISCLOSURE AND PRETEXT CALL

In September 2022, police interviewed Doe 1 at her high school after she reported being verbally abused by her stepfather. Doe 1 was 14 years old at the time. She seemed "relaxed and open" when discussing the verbal abuse, and also told the interviewing officer she was "concerned" about her younger sister (defendant's daughter) sleeping in the same bed as defendant. The officer asked her, " 'Do you think your stepdad is inappropriately touching your little sister?' " Doe 1 answered, " 'To his own daughter, no.' " When the officer asked Doe 1 whether her stepfather had ever inappropriately touched her or her sisters, she gave a "nervous smirk" and appeared to "shrink downward." Doe 1 then disclosed that her stepfather had sexually abused her.

At officers' request, Doe 1 called defendant. Their conversation was recorded and played for the jury.[1] When Doe 1 referenced "what [defendant] did to [her,]" defendant responded that he had "already apologized" and "changed." Doe 1 said, "I was 9 years

---

[1] Doe 1 and defendant spoke to one another in Spanish. The jury was provided with an English translation, which we have relied on for our summary of the conversation.

old when you did that to me" and defendant replied, "I tell you, I have asked for your forgiveness and I will ask you right now if you want, but I can't do anything." Referring to her younger sister, Doe 1 told defendant, "Just don't do the same with her like you did with me." Defendant again replied that he had changed. Doe 1 acknowledged that defendant had not "bothered" or "touched" her recently but said, "I always have memories at night." Defendant told her that she needed to forgive him.

After officers urged Doe 1 to discuss the abuse using more direct language, she asked defendant, "What would happen if I had gotten pregnant or something?" Defendant asked, "From what?" and said, "I haven't touched you again, dear." Doe 1 agreed but said defendant "did it to [her] for 3 years" and asked, "how can I forget about that?" She later said, "I just don't want you to have sex with me or my sisters again." Defendant told her, "Mija, I haven't touched you in I don't know how long." Doe 1 asked defendant why he "[did] it" and he answered, "Dear, because I don't know. Maybe it was a fucking impulse. I don't know. What do you want me to say?"

## B. INTERVIEWS OF DEFENDANT AND DOE 2

Police visited the house where defendant lived with L.P., Doe 1, and Doe 2. A female officer knocked on the door and asked the woman who answered whether she could "talk to" defendant. Defendant appeared and agreed to "talk to" the officer outside. The officer asked defendant whether he preferred to speak in English or Spanish, and he said he preferred Spanish. Defendant then followed her outside to his driveway, where a male officer and a man in a ride-along vest were standing, and frisked him for weapons. A third "cover officer" was also standing nearby. During the ensuing 20-minute conversation, which was recorded and played for the jury, the female officer spoke to defendant in Spanish and the male officer spoke to the female officer in English. We again rely on the English translation that was provided to the jury.

When asked if he knew why the officers were there, defendant said no. The female officer told him that Doe 1's school had "called" about "some things that may

3

have happened in the past." Defendant said that, based on that summary, he still did not know why the officers were there. The female officer explained that Doe 1 had told a social worker about something that happened between her and defendant when she was nine years old, and the male officer added that the officers wanted "to make sure it doesn't happen again." Defendant then acknowledged that Doe 1 had called him earlier that day. He said he had "apologized" to Doe 1 and her mother for something that had happened when Doe 1 was nine years old. Defendant admitted having committed "an abuse" and suggested he might be "going to jail" as a result. He described what had happened between him and Doe 1, explaining that he "tried to touch her."

Defendant acknowledged touching Doe 1's chest but initially denied putting his penis in Doe 1's mouth or vagina. The male officer said of Doe 1, "we feel like she's telling us the truth" and defendant replied in English, "I recognize that." Defendant then acknowledged that he was "90% … guilty" but maintained that "there was no penetration, really." The officers told defendant they already knew he had sex with Doe 1, describing it as a "mistake" he made years ago. They asked him to be "honest" and tell them how many times it happened. Defendant continued to deny having sex with Doe 1 but admitted putting his penis in her mouth about three times beginning when she was 10 years old, and ejaculating in her mouth three or four times. When asked again about Doe 1's allegation that they had sex, defendant said: "Well, I tell you, there was no penetration like that, but I would try with her. But she also no, no, no, no, she didn't want to." He denied inappropriately touching any of Doe 1's sisters.

The officers arrested defendant at the end of their conversation. They then spoke with Doe 2, who was a year or two younger than Doe 1. Doe 2 initially seemed happy but became visibly emotional when told why the officers were at her house. She recalled an incident that took place when she was nine years old. Defendant had told her to get into bed with him, pulled down her pants, and put something in her "butthole." Doe 2 said she hated defendant because of what he did to her.

4

### C. FORENSIC INTERVIEWS

A social worker interviewed Doe 1 and Doe 2 in October 2022. Both interviews were recorded and played for the jury.

#### 1. Doe 1's Interview

Doe 1 said defendant had first touched her inappropriately when she was nine years old. Defendant called her into his bedroom and removed her clothes. He pushed her head down onto his penis while she physically resisted, then took his penis out of her mouth when she said she "didn't want to do it anymore." Defendant then turned Doe 1 around and started "raping" her. After he finished, he told her to put her clothes back on and not to tell anyone what happened.

Similar incidents took place regularly until Doe 1 was 12 years old. Defendant would rub his penis against her vagina and put his fingers inside it. During one incident that happened when Doe 1 was 12 years old, she felt defendant's penis "go inside a little bit" and "it hurt." Defendant also made Doe 1 "suck" his penis 10 or 11 times, including three times when she was nine years old; five times when she was 10 years old; and once when she was 11 years old. He ejaculated on her face and underwear. When Doe 1 was 12 years old, defendant became religious and apologized to her for what he had done. Later, when Doe 1 was 13 years old, she told her mother that defendant had been "touching" her. Doe 1 told the social worker that defendant had also abused Doe 2.

#### 2. Doe 2's Interview

Doe 2 recalled the incident that took place when she was nine years old. She was in another room with her sisters when defendant told her to come into bed with him. Doe 2 got under the blanket and felt defendant touching her. He pulled her pants and underwear down and put his finger or penis inside her anus. Doe 2 felt it "swirl around in there." She was uncomfortable and did not know how to react. Afterward, she did not tell anyone what happened because she did not want L.P. to be "heartbroken" about it.

5

Defendant regularly touched her on the thigh and buttocks but did not penetrate her again.

When Doe 2 was 12 years old, she told a friend that defendant had "touched" her. The friend told her mother, and someone from "child services" interviewed Doe 2. Because she was "scared" to tell the truth, Doe 2 lied and said defendant had never touched or harmed her. Shortly before Doe 2 turned 13 years old, she told Doe 1 what defendant had done to her. Doe 1 encouraged Doe 2 to tell L.P., which she did shortly after her birthday. After Doe 1 and Doe 2 both disclosed the abuse to L.P., she confronted defendant. L.P. told Doe 1 and Doe 2 they could lock themselves in their room if defendant approached them while L.P. was at work.

### D. VICTIM TESTIMONY

At trial, both Doe 1 and Doe 2 recanted their allegations against defendant.

#### 1. Doe 1's Testimony

Doe 1 testified that defendant was a good stepfather who treated her well, she and her sisters were sad that he was gone, and she wanted the charges against him dropped. L.P. had also told Doe 1 that she wanted the charges against defendant dropped, and Doe 1 wanted her mother to be happy. Without defendant at home, L.P. had to work more to replace his income. Doe 1 acknowledged having alleged that defendant had sexually abused her, but testified that "it wasn't true." She was aware that Doe 2 had made similar allegations against defendant, and Doe 2 had shared those allegations with her. Doe 1 wrote two letters to defense counsel, asking for the charges to be dropped because she did not believe defendant deserved to go to prison. She testified that she had made false allegations against defendant because she "wasn't thinking right" and "just said whatever" when police "mentioned rape."

#### 2. Doe 2's Testimony

Doe 2 also testified that she had a good relationship with defendant. She wanted the charges dropped and defendant released from jail. Doe 2's younger sister was sad

6

that defendant was gone, and Doe 2 felt responsible for that. L.P. had to work more without defendant at home. Doe 2 acknowledged having told L.P. and Doe 1 that defendant had abused her, but testified that she had lied to them. She had also lied to a friend about being abused, and told the truth (by denying the abuse) when interviewed about what she had told her friend. Her statements to police and the social worker were also false, and defendant had not done anything to her. When asked whether she wanted defendant back home, Doe 2 answered: "Not at home but I just don't want him here in jail. I just want all this to be over, to be honest."

### E. OTHER PROSECUTION EVIDENCE

Defendant's friend testified that he was working with defendant to prove defendant's innocence and defendant had called him from jail about 70 times. Both defendant and his friend were chaplains at the same church. While defendant was in jail, his friend helped organize a religious ceremony intended to remove demons from L.P.'s body. L.P. cried during the ceremony. On the first day of defendant's trial, his friend (who had been ordered via subpoena to appear in court) brought a folder containing documents that he considered helpful to defendant's case. Courthouse surveillance video appeared to show him discussing the documents with L.P. Doe 1 and Doe 2 also appeared to review the documents.

A psychologist testified as an expert on "the psychological effects of child sexual assault." (Before trial, the court had denied a defense motion seeking to exclude such evidence.) The expert was not familiar with the facts of the case and testified generally in order to dispel possible misconceptions about how children respond to sexual abuse. He explained that child victims may refrain from reporting abuse because it is committed by someone they trust and rely on; disclose the abuse incrementally; appear unemotional when discussing the abuse; and falsely deny or recant abuse allegations. The court instructed the jury that it could consider the expert's testimony "only in deciding whether

7

or not Jane Doe's conduct was consistent with the conduct of someone who has been molested and in evaluating the believability of the alleged victim."

On cross-examination, the expert said there was no single "profile" of an abuser or child sexual abuse victim. When asked by defense counsel about a hypothetical case in which children made false allegations and then recanted because they realized they should not have done so, the expert acknowledged that scenario was "possible." He added: "When we talk about what's possible or probable or likely to happen, those are different things, but, I mean, I could get struck by lightening [*sic*] on the way home. So, again, it's a matter of how likely or probable things occur and how we know about those things." Counsel did not object to the expert's answer but later moved for a mistrial, which the court denied.

## F. DEFENSE CASE

L.P. testified that she was not a member of defendant's church, had resisted joining, and had argued with defendant about religion. While defendant was in jail, L.P. attended a religious ceremony organized by other members of defendant's church. At some point before the ceremony, L.P. met with a defense investigator and provided defense counsel with a letter asking for the charges against defendant to be dropped. On cross-examination, L.P. denied that either Doe 1 or Doe 2 had told her about being abused by defendant. She also denied that defendant had apologized to her for touching her daughters.

Defendant testified on his own behalf. He declined to answer defense counsel's questions, and the court permitted him to instead testify in narrative form. He then made the following statement: "Well, first of all, I'd like to thank everybody who's here for coming, for your time, and everything. [¶] And, second of all, I – on May 4th, I made a phone call. And when I was making the phone call, my Lord and Savior Jesus Christ appeared to me and he gave me some words through the prophet. [¶] What he told me is that I'm innocent, and he told me also that if they didn't put – set me free that my Lord

8

Jesus Christ would shake the earth. That's a revelation. That's the – it's a recording from May 4th. [¶] Well, that's what I wanted to say is that the words that he spoke to me are that I'm innocent and that if I'm not given my freedom, that he will shake the foundations of the earth this Saturday, the 23rd. I don't know the time. I hope that it won't be here in – what do you call it, here in Salinas. It will be in California, but if it's in Salinas, that I don't know. [¶] That's what I wanted to say and I needed to say that so that there's no blood on my hands." On cross-examination, defendant repeatedly stated that Jesus Christ had told him he was innocent.

## G. JURY DELIBERATIONS AND VERDICT

While deliberating, the jury asked for a readback of Doe 1's testimony; to review the transcript of the initial police interview of Doe 2; the transcript of Doe 1's pretext call; the transcript and video recording of defendant's driveway interview; and the transcripts of the forensic interviews. The next day, the jury asked to "view the pretext phone call and the driveway interview in open court along with the translations." The jury also asked for the definitions of certain Penal Code sections listed on the verdict forms for counts 2, 4, 6-12, and 14. In response, the court directed the jury to disregard those sections and refer to the court's instructions.

The jury found defendant guilty on all 14 counts. As to counts 7, 8, 9, 11, 12, and 14, the jury found true an allegation that the offenses were committed against more than one victim. As to counts 2, 4, 6, and 10, the jury found the same allegation not true.

## H. NEW TRIAL MOTION AND SENTENCING

Defendant moved for a new trial based on grounds including the purportedly erroneous admission of expert testimony regarding child sexual abuse, as well as an error on the verdict form for count 7. That count charged defendant with forcible rape of a child (§ 261, subd. (a)(2)), but the verdict form incorrectly referenced a different statute defining lewd acts on a child (§ 288, subd. (a)). At a hearing on the new trial motion, defense counsel noted that the verdict forms for counts 2, 4, 6, and 10-12 (in which

9

defendant was charged with *forcible* lewd acts on a child (§ 288, subd. (b)(1))) also incorrectly referenced section 288, subdivision (a). Counsel also noted that the verdict forms for counts 1, 3, and 5 (which charged defendant with oral copulation or sexual penetration of a child (§ 288.7, subd. (b))) incorrectly referenced section 288.7, subdivision (a) (pertaining to sexual intercourse or sodomy with a child). The court denied the new trial motion, acknowledging the errors on the verdict forms but finding no "miscarriage of justice" based on the "overwhelming" evidence of defendant's guilt.

The court imposed an aggregate sentence of 185 years to life in prison, consisting of consecutive 15-years-to-life terms on counts 1, 3, 5, and 13 and consecutive 25-years-to-life terms on counts 7, 9, 11, 12, and 14. With respect to counts 2, 4, 6, 8, and 10, the court imposed concurrent terms or stayed imposition of sentence under section 654.

## II.  DISCUSSION

### A. EVIDENTIARY INSUFFICIENCY (COUNT 11)

Defendant argues there is insufficient evidence to support his conviction on count 11, which charged him with the forcible lewd or lascivious act of touching Doe 1 on the stomach. (§ 288, subd. (b)(1).) A conviction must be supported by substantial evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) The Attorney General conceded in the respondent's brief that the record before us at that time (which did not yet include the video recording of Doe 1's forensic interview) did not reveal substantial evidence of defendant's guilt on count 11 as charged. The recording of Doe 1's forensic interview has since been transmitted to this court, and the Attorney General has not indicated any change in position regarding the sufficiency of the evidence. We have reviewed the record and agree with the parties that it does not support a conviction for the alleged forcible lewd or lascivious act of touching Doe 1's stomach. We will therefore reverse that conviction and bar retrial on count 11.

## B. ERRONEOUS VERDICT FORMS (COUNTS 1-7, 10-12)

Defendant contends that various errors on the verdict forms deprived him of due process and the right to a jury trial, and the trial court abused its discretion in denying his motion for a new trial based on some of those errors. In addition to renewing the arguments made in connection with his new trial motion, defendant now notes an additional error on the verdict forms for counts 8-12. Although those counts charged defendant with committing various sexual acts against a victim under 14 years old, the verdict forms stated that the charged offenses occurred during a period of time that extended beyond the alleged victim's 14th birthday. The Attorney General argues defendant forfeited his objection to the incorrect date range. With respect to the other defects in the verdict forms, the Attorney General acknowledges the errors and does not assert forfeiture but argues defendant was not prejudiced and the trial court properly denied his new trial motion.

We review the trial court's denial of the new trial motion for abuse of discretion. (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "The effect of this provision is to eliminate any presumption of injury from error and to require that the appellate court examine the evidence to determine whether the error did in fact prejudice the defendant." (*People v. Jacobs* (1991) 230 Cal.App.3d 1337, 1346.) The parties appear to agree that under the applicable prejudice standard, an erroneous verdict form is harmless if it is unmistakably clear under the totality of the circumstances that the jury intended to convict the defendant of the crime charged. (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272 (*Camacho*).) Defendant rightly identifies numerous basic

11

errors that are unacceptable in any criminal proceeding, and particularly in a case with exposure of this magnitude. Despite our concern about the presence of those errors, appellate relief is available only to the extent of an adverse effect on the outcome of the proceeding. As we will explain, we conclude only some of the errors were prejudicial under the circumstances here.

### 1. References to Section 288, Subdivision (a) (Counts 2, 4, 6, 7, 10-12)

Defendant was charged in counts 2, 4, 6, and 10–12 with committing forcible lewd or lascivious acts on a child. (§ 288, subd. (b)(1).) He was also charged in count 7 with forcible rape of a child. (§ 261, subd. (a)(2).) The verdict forms for those seven counts correctly named the charged offenses, but incorrectly indicated that defendant was being charged with those offenses under section 288, subdivision (a). That section defines the crime of lewd or lascivious acts on a child, which (unlike the charged offenses) does not include force as an element.

Because defendant was charged in count 14 with violating section 288, subdivision (a), the jury was instructed on that statute and its requirements. The jury asked the trial court for the definitions of various other Penal Code sections referenced on the verdict forms, indicating that jurors relied during deliberations not only on the plain text of the forms themselves but also on the particular statutes referenced. Although the trial court responded by directing the jury to disregard the specific Penal Code sections referenced in the jury's question (which pertained to the multiple-victim allegation and were not expressly mentioned in the instruction relating to that allegation), it did not instruct the jury to disregard the verdict forms' erroneous references to section 288, subdivision (a) (which *was* expressly mentioned in the instruction relating to count 14). The charges were correctly identified in the prosecutor's argument and the trial court's instructions, but the record also suggests the jury may have relied on verdict forms that incorrectly identified the statute supporting those charges.

Asserting harmlessness, the Attorney General cites *Camacho*, *supra*, 171 Cal.App.4th 1269. In that case, Camacho stole a car occupied by two people. (*Id.* at p. 1272.) He was charged with two counts of carjacking and two counts of robbery (one count of carjacking and one count of robbery per victim) and convicted on all four counts. (*Id.* at p. 1271.) Although the verdict form for one of the robbery counts incorrectly indicated that it related to a carjacking charge, it was unmistakably clear under those circumstances that the jury intended to convict Camacho of robbery on that count. (*Id.* at pp. 1272–1274.) Here, there was greater potential for jury confusion because the charges all involved alleged sexual acts for which defendant could have been (but was not) charged with violating section 288, subdivision (a). And as we have discussed, the jury's communication with the trial court also suggested possible confusion. The trial court's focus on the strength of the evidence against defendant rather than the jury's unclear intent constituted an abuse of discretion. Under the circumstances, it is not unmistakably clear that the jury intended to convict defendant of the crimes charged in counts 2, 4, 6, 7, and 10-12. We will therefore reverse defendant's convictions on those counts, subject to possible retrial (with the exception of count 11, on which defendant may not be retried due to evidentiary insufficiency).

## 2. References to Section 288.7, Subdivision (a) (Counts 1, 3, 5)

Counts 1, 3, and 5 charged defendant with oral copulation or sexual penetration of a child 10 years old or younger. (§ 288.7, subd. (b).) The verdict forms for those counts incorrectly referenced section 288.7, subdivision (a), which instead relates to the crime of sexual intercourse or sodomy with a child 10 years old or younger. The content of section 288.7, subdivision (a) was not referenced in the verdict forms. Defendant was not charged with sexual intercourse or sodomy with a child 10 years old or younger, and the jury was not instructed on that offense. The prosecutor's argument, the trial court's instructions, and the verdict forms themselves made clear that the charges related to oral copulation rather than sexual intercourse or sodomy. Under the circumstances, it is

13

unmistakably clear that the jury intended to convict defendant of the crimes charged in counts 1, 3, and 5. The erroneous references to section 288.7, subdivision (a) did not deprive defendant of due process or a jury trial.

### 3. Incorrect Date Ranges (Counts 8-12)

Counts 8-12 charged defendant with various lewd or lascivious acts on a child under 14 years old. (§ 288, subd. (b)(1).) Although the alleged victim (Doe 1) turned 14 years old in 2021, the verdict forms incorrectly stated that the offenses occurred between 2016 and 2022. Defendant argues the jury thus could have found him guilty based on conduct that took place after Doe 1's 14th birthday. We agree with the Attorney General that defendant forfeited that argument by not making it in the trial court. (*People v. Lewis* (1983) 147 Cal.App.3d 1135, 1142.)[2] In any event, the evidence clearly established that defendant stopped sexually abusing Doe 1 when she was 12 years old, and the prosecution did not allege that any abuse took place after that point. If we were to reach the issue, we would thus find the error harmless because it is unmistakably clear that the jury intended to convict defendant for conduct that took place before the victim turned 14 years old. For the same reason, we reject defendant's alternative contention that his counsel was ineffective in failing to object to the verdict forms in the trial court.

### C. ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues trial counsel was ineffective for not seeking suppression of the driveway interview under *Miranda v. Arizona* (1966) 384 U.S. 436. To safeguard the constitutional privilege against self-incrimination, a defendant's statements made in a

---

[2] Defendant urges us to apply section 1259, which provides that instructional errors "which affected the substantial rights of the defendant" may be reviewed for the first time on appeal. Assuming that statute is applicable to the type of error identified here, we would nonetheless find defendant's argument forfeited because the incorrect date ranges on the verdict forms did not affect his substantial rights under the circumstances presented.

custodial interrogation cannot be admitted at trial unless the defendant was advised of the right to remain silent. (*Id.* at pp. 468–469.) The right to a *Miranda* advisement attaches whenever a person is in custody and is subject to express questioning or its functional equivalent. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300.)

To establish ineffectiveness of trial counsel in violation of a defendant's right to counsel under the Sixth Amendment to the United States Constitution, a defendant must show both that counsel's performance was deficient and that he was prejudiced by the deficiency. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) To prove prejudice, a defendant must affirmatively show a reasonable probability that, but for his trial counsel's errors, the result would have been different. (*Id.* at pp. 693–694.) Where the alleged error is counsel's failure to make a suppression motion, a defendant "must do more than show the motion would have been meritorious." (*People v. Gonzalez* (1998) 64 Cal.App.4th 432, 438.) The defendant "must show, in addition, the motion would have been successful." (*Ibid.*)

The Attorney General contends a suppression motion would not have been successful because defendant was not in custody during the driveway interview. A suspect is in custody for *Miranda* purposes if "a reasonable person in the suspect's position during the interrogation [would] experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest." (*People v. Aguilera* (2016) 51 Cal.App.4th 1151, 1161.) Factors to be considered include "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of

15

movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Id.* at p. 1162.) "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Ibid.*)

Here, some of the *Aguilera* factors at least arguably weigh in favor of a finding that defendant was in custody during the driveway interview. Police initiated the interview following Doe 1's disclosure of sexual abuse by defendant (although he did not yet know why they wanted to talk to him). Defendant was interviewed alone by two officers while a third officer stood nearby, as did an unidentified man in a ride-along vest. The interviewing officers frisked defendant for weapons before speaking to him and did not inform him at any point that he was free to end the interview or leave. They repeatedly said that they already knew defendant was guilty based on what Doe 1 had told them, and pressed him to admit guilt when he denied certain accusations. But other factors weigh strongly against a finding that defendant was in custody. Defendant was interviewed during daylight hours and in his own driveway for a period of 20 minutes. He voluntarily agreed to speak with police, who maintained a conversational tone and volume, even when their questioning became accusatory. Although defendant was outnumbered by the officers, at no point did they position themselves to surround him. Other than briefly during a pat search, defendant was not physically restrained in any way during the interview. Considering the totality of the circumstances, and mindful that "courts have generally been much less likely to find that an interrogation in the suspect's

16

home was custodial in nature" (*United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1083), we conclude a suppression motion would have been denied and defendant was thus not prejudiced by his counsel's failure to bring that motion.

### D. CHILD SEXUAL ABUSE EXPERT TESTIMONY (COUNTS 7, 11, 12-14)

Defendant makes several arguments related to the court's admission of expert testimony on child sexual abuse, as well as its associated instruction to the jury. The expert did not expressly testify about Child Sexual Abuse Accommodation Syndrome (CSAAS), a concept frequently addressed in cases involving child sexual abuse, but the parties both cite cases discussing CSAAS evidence and we find those cases instructive. In *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*), the California Supreme Court expressly endorsed the use of CSAAS testimony "to rehabilitate [] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation."

#### 1. No Error in Admitting Alleged Profile Evidence

According to defendant, large portions of the expert's testimony constituted inadmissible "profile evidence" that deprived defendant of due process. The Attorney General urges us to find that argument forfeited, but we decline to do so because defendant made similar arguments in a pretrial motion that was denied by the trial court. We review a trial court's decision to admit expert testimony for abuse of discretion. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1299–1300.)

As we have noted, the California Supreme Court has approved the use of similar testimony to rebut a defendant's suggestion that an alleged victim's behavior was inconsistent with having been abused. (*McAlpin*, *supra*, 53 Cal.3d at p. 1300.) The expert testimony in this case was used only for that limited purpose, and the court instructed the jury accordingly. On cross-examination, the expert specifically denied that any "profile" exists for either an abuser or a child sexual abuse victim. We see no abuse of discretion or due process violation in the trial court's admission of the challenged

evidence. For the same reasons, we also reject defendant's associated prosecutorial misconduct claim. As we have not found forfeiture and have rejected defendant's argument on the merits, we do not reach his alternative claim of ineffective assistance of counsel.

## 2. No Prejudice From Improper Expert Testimony

On cross-examination, defense counsel asked the expert witness whether "there could be a case where -- and maybe you don't know this -- that they've lied about the abuse and then realized they've done something wrong." The expert acknowledged that such a scenario was "possible" but added that it was also possible he "could get struck by lightening [*sic*] on the way home." Counsel did not immediately object to the expert's answer but later moved for a mistrial, which the trial court denied. Defendant now contends the court abused its discretion in not granting a mistrial and he was denied a fair trial by the expert's comparison between the likelihood of false allegations and the likelihood of being struck by lightning. The Attorney General asserts invited error and forfeiture, but we will review the merits of the claim given the mistrial motion and the extent to which the testimony gratuitously exceeded the scope of trial counsel's question to the witness.

A mistrial "should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) Here, defense counsel asked the expert witness about the possibility that a child might falsely allege sexual abuse and later recant after realizing he or she had done something wrong. The witness acknowledged the hypothetical scenario was "possible," and went on to posit a distinction between "what's possible or probable or likely to happen." He then made reference to being struck by lightning on the way home, which we interpret as illustrating the distinction with an example of something that is possible but commonly understood as extremely unlikely. Although we do not interpret the statement as offering a direct opinion on the relative likelihood of false abuse allegations by a child, the answer was

18

nonetheless improper because it invited a comparison between the likelihood of false allegations and the likelihood of being struck by lightning. Considered in context, the statement elicited in cross-examination was not incurably prejudicial and did not deprive defendant of a fair trial. Nor do we see a reasonable probability of a different result if not for the improper statement, given the strong evidence of guilt. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 180 (*Lapenias*).) We emphasize, however, that an expert— especially an experienced witness—is expected to know and adhere to the proper scope and limitations of his or her testimony.

### 3. No Instructional Error

With respect to the expert testimony, the trial court instructed the jury in part that it could consider that testimony "only in deciding whether or not Jane Doe's conduct was consistent with the conduct of someone who has been molested and in evaluating the believability of the alleged victim." Defendant asserts that instruction improperly allowed the jury to conclude the alleged victims were abused because they fit the profile of a typical abuse victim, and use the expert testimony to conclude defendant was guilty of the crimes charged. He made no such objections to the instruction in the trial court. As the Attorney General has requested a ruling on the question of forfeiture, we acknowledge defendant's failure to object but nonetheless consider the merits of his appellate contentions because he alternatively asserts ineffective assistance of counsel— and because " '[w]hether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim' … ." (*People v. Ngo* (2014) 225 Cal.App.4th 126, 149; see § 1259.)

The challenged instruction was based on the language of CALCRIM No. 1193, which has consistently been approved by appellate courts as an accurate statement of the law relating to CSAAS testimony. (See, e.g., *People v. Ortiz* (2023) 96 Cal.App.5th 768, 816; *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176; *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504.)

19

Though defendant notes that the previous version of CALCRIM No. 1193 approved in past cases used the double negative "not inconsistent with" instead of the phrase "consistent with" (which the trial court used here), we are satisfied that the two phrases are semantically equivalent. The instruction given here was consistent with the current version of CALCRIM No. 1193, which has eliminated the double negative in favor of a plain English construction to enhance juror comprehension. (See Cal. Rules of Court, rule 2.1050(a) [Judicial Council goal is to provide "standardized instructions that accurately state the law in a way that is understandable to the average juror"].) As for the court's instruction that jurors could use the expert testimony to evaluate the believability of the alleged victims, defendant has not provided a compelling reason for us to depart from established precedent endorsing the language of CALCRIM No. 1193. (See, e.g., *Ortiz*, at pp. 815–816.) We conclude the trial court properly instructed the jury and there is no reasonable likelihood the jury applied the instruction in an impermissible manner. (*Id.* at p. 816.)

## E. ALLEGED PROSECUTORIAL MISCONDUCT

Defendant faults the prosecutor for referring to Doe 1 and Doe 2 as "victims" during the trial, improperly questioning various witnesses, and engaging in allegedly improper argument. The trial court sustained objections to many of the challenged statements, and others drew no objection from defense counsel. We have reviewed each alleged act of prosecutorial misconduct in the context of the entire record. Even assuming all the acts constituted misconduct and taking into account their cumulative effect, we find no prejudice to defendant. We see no reasonable probability that the misconduct affected the outcome, nor was any misconduct so pervasive that it deprived defendant of a fair trial. (*People v. Roberts* (2021) 65 Cal.App.5th 469, 480 (*Roberts*).) For the same reasons, we reject defendant's contention that trial counsel rendered ineffective assistance by failing to object to some of the prosecutor's statements.

20

Nonetheless, we agree with defendant that some of the prosecutor's statements were improper. We briefly discuss them to express our disapproval. (*Roberts*, *supra*, 65 Cal.App.5th at p. 481.) The prosecutor's opening statement and closing argument included repeated references to defendant having "raped" Doe 1 and Doe 2 on numerous occasions beginning when they were nine years old. The prosecutor asked Doe 1 about defendant: "Do you remember telling him that you didn't want him to rape your little sisters too?" While cross-examining L.P., the prosecutor raised the possibility of defendant moving back into her house and asked, "You don't have any concerns that he'll rape your daughters?" (A defense objection to that question was sustained.) And while cross-examining defendant, the prosecutor asked him whether he had raped Doe 2 in the bed he shared with his wife. Defendant answered, "I already told you" (apparently referring to previous answers in which he had professed his innocence or evaded the prosecutor's questions). The prosecutor responded, "You certainly told Officer Gansen" (referring to one of the police officers involved in the investigation). Defense counsel objected to the prosecutor's statement on the ground that no question had been asked, and the trial court sustained the objection.

The prosecutor's comments were improper argument and misstated the evidence, appearing to use the word "rape" as an umbrella term to describe all of defendant's alleged conduct. Defendant was charged with one count of rape, with that count alleging Doe 1 as the victim. Doe 1 never used the word "rape" in the pretext call, and defendant never admitted raping Doe 2 in either the pretext call or the driveway interview. A prosecutor's statement of facts not in evidence constitutes misconduct. (*People v. Bolton* (1979) 23 Cal.3d 208, 212.) But given the sustained objections to several of the prosecutor's improper questions, the jury instruction that the attorneys' statements were not evidence, and the strength of the evidence supporting the charges, we see no prejudice to defendant from the improper remarks.

21

**F. NO CUMULATIVE PREJUDICE**

Defendant asserts he was prejudiced and denied a fair trial by the cumulative effect of the trial court's alleged errors. We have found that defendant was not prejudiced by errors on the verdict forms, trial counsel's performance, improper expert testimony, or prosecutorial misconduct. Even considering all identified errors and alleged errors, we conclude they did not deprive defendant of a fair trial and given the strong evidence of guilt we see no reasonable probability they affected the result given the very strong evidence of guilt.

Our conclusion that defendant was not prejudiced is not an endorsement of the way this trial was conducted. This case demanded more precise handling from trial counsel and the trial court.

## III.    DISPOSITION

The judgment is reversed and the matter is remanded with directions to vacate the convictions on counts 2, 4, 6, 7, 10, 11, and 12. Defendant may not be retried on count 11 (due to evidentiary insufficiency) but may be retried on counts 2, 4, 6, 7, 10, and 12. Following retrial or the prosecution's election not to proceed with retrial, defendant shall be resentenced.

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Lie, J.

H051613
*The People v. Lopez*